Irving Cairns died, resident in New Jersey, February 17th, 1939, aged 86, leaving a will whereby he gave all his estate *Page 315 
in equal proportions to his two sons, Clifford I. Cairns and Edward Cairns, and named them executors. His net estate, at death, was a trifle over $90,000.
Prior to his death, on October 18th, 1935, the decedent made two gifts to his two sons, — one to Clifford amounting to $40,522.08 and one to Edward, amounting to $46,793.59, — total $87,315.67. It is the taxability of these two transfers which is in issue on this appeal. The sole question presented by the appellant is, — did the Commissioner err in finding that they were made in contemplation of death? Appellant concedes that if they were made in contemplation of death within the intendment of our statute, they are taxable, and the tax should be affirmed.
In the instant case the donor admittedly, although 83 years old, was in excellent health and strength, had had no prior illness, and came of an extremely long-lived family. There is no evidence upon which there could validly be based a conclusion that he had any actual contemplation of death other than as something which would occur at some indefinite time in the future.
Gifts taxable as having been "made in contemplation of death" are however not limited to transfers made in, and because of, the transferor's contemplation and belief that his death is imminent, or that it is apt to occur in the not distant future.Schweinler v. Martin, 117 N.J. Eq. 67, 175 Atl. Rep. 71;Nicholas v. Martin, 128 N.J. Eq. 344, at 346, 15 Atl. Rep.
2d 235. What does constitute an inter vivos gift "made in contemplation of death?" It has been frequently stated that it is meant to comprise those inter vivos gifts which are the result of that kind of contemplation of death which leads to testamentary disposition. This however is not as helpful as could be desired, in the way of a practical definition.
It seems clear that a consideration of the purpose and history of the legislation, the statutory language, and the adjudicated cases, that it is the true intent and meaning of the statutory provisions comprised in R.S. 54:34-1, c., that any intervivos transfer which is in fact a substitute for a testamentary (or intestate) transfer shall be subject to the *Page 316 
tax; (and conversely, that any inter vivos transfer which is not such a substitute, is not to be taxed).
The object and purpose of the statute as a whole, is to tax transfers occurring at death, — testamentary and intestate transfers, — and also inter vivos transfers which are testamentary in character and made in place of testamentary or intestate transfers. The first provision made by the legislature in the way of making some inter vivos gifts taxable in addition to the testamentary and intestate transfers, was that which made taxable inter vivos gifts "intended to take effect in possession or enjoyment at or after the death of the transferor." Such transfers were obviously substitutes for testamentary disposition. Some years later it recognized that there were other transfers inter vivos which were substitutes for testamentary disposition, (in addition to those transfers made presently but intended to take real effect at death), and added transfers "made in contemplation of death" as subjects of taxation. By this clause the legislature intended to make taxable, in addition to inter vivos transfers intended to take real effect at or after death, all other transfers intervivos made as substitutes for testamentary transfers. SeeSchweinler v. Martin, supra, pp. 72, bottom to 75, top,88 bottom, 90 top; Hartford v. Martin, *122 N.J. Law 283, at 286, 4 Atl. Rep. 2d 31.
It is deemed thoroughly settled that if and whenever, an intervivos gift is intentionally made in the place and stead of a testamentary disposition, it is taxable under the statutory provisions. Central Hanover Bank, c., v. Martin, 129 N.J. Eq. 186,
at p. 189, 18 Atl. Rep. 2d 45; Perry v. Martin,125 N.J. Law 46, at 47, 14 Atl. Rep. 2d 266; Scheider v.Martin, 124 N.J. Law 567, 12 Atl. Rep. 2d 678, affirmingS.C. 127 N.J. Eq. 323, at 324-5, 13 Atl. Rep. 2d 223;Nicholas v. Martin, 127 N.J. Law 35, 21 Atl. Rep. 2d323, affirming S.C. 128 N.J. Eq. 344, 15 Atl. Rep. 2d235; MacGregor v. Martin, 126 N.J. Law 492, at 497, top,20 Atl. Rep. 2d 427; In re Grabfelder, *107 N.J. Law 520,153 Atl. Rep. 532. Conversely, of course, inter vivos gifts which were not made in lieu of testamentary disposition, are not taxable. *Page 317 
The further question, however, remains to be ascertained and determined, — under what circumstances is an inter vivos gift a transfer in lieu of testamentary disposition, — a substitute for testamentary gift?
A transfer inter vivos in order to be a substitute for testamentary disposition must needs be substantially similar in nature and character to a testamentary transfer, — both as regards the thing transferred and the purpose of the transfer. To be thus substantially similar it must be one which is made for the purpose of accomplishing, and which does accomplish, substantially the same results as those accomplished by a testamentary (or intestate) transfer. A transfer which is not made for such purpose or which does not accomplish such results, is not a substitute for testamentary disposition.
Testamentary and intestate transfers accomplish the transfer of those interests in property which exist after the transferor's death, — "post mortem interests." They do not, (obviously they cannot), transfer any purely "ante mortem interests" in the property, — interests which exist only prior to, and not after, the transferor's death.
The purpose of the testamentary (or intentionally intestate) transfer is, therefore, that of accomplishing the transfer ofpost mortem interests in property. The interests which the transferor purposes to transfer may be the whole ownership of property, or some lesser interests; and his purpose may be that the transferee shall certainly have and enjoy such interests, or that he shall have and enjoy them only under certain contingencies. In the last analysis, however, the intent and purpose of the testamentary transferor is to accomplish that the transferee shall have and enjoy, after the transferor's death, the property or interests transferred.
An inter vivos transfer, in order to be a substitute for a testamentary transfer, must therefore be one which accomplishes the transfer of post mortem interests in property, and it must be one which is made for the purpose of accomplishing the transfer of such post mortem interests. The transferor's purpose must be that the transferee shall, either certainly or contingently, have and enjoy, after the transferor's death, the property interests transferred. If an inter vivos transfer *Page 318 
is made for that purpose, and accomplishes that purpose, it is a substitute for testamentary transfer, — and taxable; otherwise not.
So far, then, the statutory provisions as to the imposition of tax on inter vivos transfers, — R.S. 54:31-1, c., — (disregarding the provisions as to residence of transferor orsitus of property), may be properly paraphrased substantially as follows:
"Where the transfer is made inter vivos and is intended to take effect in possession or enjoyment at or after the death of the transferor, or is otherwise made as the result of a purpose that the transferee shall or may have and enjoy, after the transferor's death, the property transferred or some interest therein."
(Some modification of this paraphrase must be made, however, as will be seen later herein.)
Inter vivos transfers may comprise the transfer either (1) of only ante mortem interests in property, (such as an estate for the life of the transferor); or (2) only post mortem interests, (such as an estate in remainder subject to a life estate in transferor); or (3) both ante mortem and post mortem
interests. Transfers of this last kind may comprise either (a), both ante mortem and post mortem interests, separately expressed (such as an estate to A for the life of the transferor and a remainder to B at the transferor's death); or (b), the complete ownership of all interests, ante mortem and postmortem, as a single whole.
It is clear that an inter vivos transfer of purely antemortem interests, is not, and cannot be, a substitute for testamentary disposition, because it is not substantially similar thereto. Although it is true that the transferor, in making aninter vivos transfer of an estate for the life of the transferor, "contemplates," — has in mind, — his own death, (because the interest which he transfers is an interest only until such death), nevertheless such a transfer was not intended by the legislature to be taxable under the "contemplation" clause, because it is not testamentary in character, — not a substitute for a testamentary transfer. It transfers only antemortem interests, — which a testamentary transfer *Page 319 
does not and cannot do; it does not transfer any post mortem
interests, — which is the only thing a testamentary transfer does or can do.
On the other hand inter vivos transfers which comprise only
interests which are essentially post mortem interests, are
substantially similar to testamentary transfers. An inter vivos
transfer which comprises nothing but post mortem interests is a transfer which does not take effect in possession or enjoyment until at or after the transferor's death, notwithstanding that the actual transfer of the legal title to the post mortem
enjoyment operates immediately. (It is this of course which makes it a substitute for testamentary transfer; if the transfer of this legal title did not occur until death it would be a testamentary transfer.) The present gift of an estate in remainder subject to a life estate in the transferor is an illustration of such a transfer. The thing which it accomplishes, (and which it is intended to accomplish), is that the transferee shall have, after the transferor's death, the enjoyment of the property transferred, — and this is just what a testamentary transfer of the property is intended to, and does, accomplish.
Such a transfer, therefore, — one of only post mortem
interests, — is a substitute for testamentary disposition, and is intended to be taxable under the statute. As to this of course there is no doubt, because the statute makes taxable, in express words, any transfer "intended to take effect in possession or enjoyment at or after the death of the transferor."
Next, as to inter vivos transfers of both ante mortem andpost mortem interests; and first as to those where the transfer comprises a purely ante mortem interest and a purely postmortem interest, separately expressed. In such cases, even if the two interests together comprise a complete whole of all the interests in the property, that part of the transfer which comprises the post mortem interest is taxable. It comes directly within the scope of the express provision as to intervivos transfers intended to take effect after the donor's death. — Koch v. McCutcheon, 111 N.J. Law 154, 167 Atl. Rep. 752;Hartford v. Martin, 120 N.J. Law 564, 1 Atl. Rep. 2d 13;
and it is, as to the post mortem interests, clearly *Page 320 
a substitute for testamentary disposition, — a disposition of the interests existing after the donor' death.
Finally, as to those cases where the transfer, although comprising both ante mortem and post mortem interests, makes no separation of such interests but is a transfer of the complete ownership, — the whole of all interests as a single entirety.
As was said earlier herein, — in order that an inter vivos
transfer be a substitute for testamentary transfer, it is requisite that both the thing accomplished by the transfer and the purpose of the transferor be substantially the same as in the case of testamentary transfer. In the other classes of intervivos transfer which we have considered, the matter of determining the donor's purpose has been of little or no importance. The transferor's purpose and intent is of course to do that which he does; where the thing which the transfer accomplishes is the same as that of a testamentary transfer and nothing more, or where it does not accomplish anything similar to a testamentary transfer, no further consideration need be given to ascertaining his purpose. But where the transfer accomplishes not only substantially the same thing as a testamentary transfer, but also accomplishes things which a testamentary transfer cannot accomplish, — (as is the case in inter vivos transfers of the whole ownership in property), — it does become essential to ascertain the donor's purpose, — or rather his chief purpose (because he has at least two purposes). By the inter vivos
transfer of whole ownership he accomplishes the transfer of theante mortem interests or enjoyment and also the transfer of thepost mortem interests or enjoyment. He has a purpose and intent to do that which he in fact does, hence he has a purpose and intent to accomplish the transfer of each of those interests.
If that chief purpose is to accomplish that the transferee shall have and enjoy the property after the death of the transferor, the purpose is similar to that of the testamentary transferor, and the transfer is such a substitute. If the chief purpose is that the transferee shall have, use and enjoy the property at once, before the (probably) death of the transferor, — that is a purpose which cannot be accomplished by *Page 321 
a testamentary transfer, and the transfer is not a substitute for a testamentary or intestate transfer.
If a man, believing himself to be almost at the point of death and desiring to dispose of the "post mortem" ownership and enjoyment of his property, makes a presently effective intervivos gift of the whole interest therein because he is apprehensive that he may not live long enough to have a will drafted and executed, no one will deny that such transfer is testamentary in nature and in lieu of testamentary disposition. Although that gift accomplishes a transfer of all the interests, (including some ante mortem interest), in the property, the principal thing it accomplishes is the transfer of the postmortem interests in the property. The transfer of the antemortem interests was of no real concern to the transferor; his chief purpose was to accomplish the transfer of the post mortem
interests, — to provide that the transferee should have and enjoy, after the transferor's death, the property transferred.
On the other hand, if a wealthy man, of middle age and in perfect health, makes a gift of say $10,000 to a son who has just finished his education, in order to start him off in business, it would never be contended by the state that such transfer is testamentary in nature and in lieu of testamentary disposition. The transferor's concern is not that the transferee shall have the enjoyment of the property after his death; his chief intent and purpose is that the transferee shall have, enjoy and utilize, the property transferred, at the present time, during the transferor's life, no matter what may have become of it by the time of the transferor's death.
In cases of inter vivos gift of whole ownership, then, the donor's chief purpose must be ascertained. He may have had the purpose that the transferee should have the post mortem
enjoyment of the property; the purpose of avoiding inheritance taxes; the purpose of saving income taxes; and the purpose of having the transferee have immediate and ante mortem enjoyment of the property, — or divers other purposes. The test is as to what was the controlling purpose, — or rather, was the purpose of accomplishing the transfer of the post mortem interests a controlling purpose for the making of the *Page 322 
gift, — was it a purpose in the absence of which the particular gift would not have been made.
If the donor's chief purpose was to accomplish a present, antemortem benefit to the donee which could not be accomplished in any other way than by a present gift of whole ownership, — (such as a gift in order to start a son in business, or to save his life, or to enable him to marry, or the like); or if the donor, notwithstanding a desire and purpose on his part that the donee should have and enjoy the property after the donor's death, would nevertheless have made the present gift of whole ownership, even if he thought it likely that the property would be lost, squandered or used up prior to the (probable) time of his (the donor's) death; than the purpose of having the donee enjoy thepost mortem interest in the property is not a controlling purpose for the making of the present gift and the gift is not in lieu of testamentary disposition and is not taxable.
But if a controlling purpose for the making of such an intervivos gift is that the donee shall have and enjoy, after the transferor's death, the post mortem interests (or some of them) therein, the transfer is a substitute for testamentary transfer and taxable. It is not necessary that this shall be the sole purpose. The fact that there are other additional purposes does not prevent the gift from being taxable as such a substitute.Schweinler v. Martin, 117 N.J. Eq. 67, at p. 90, et seq.,175 Atl. Rep. 71; In re Grabfelder, *107 N.J. Law 520,153 Atl. Rep. 532; Nicholas v. Martin, 128 N.J. Eq. 344, at 357,15 Atl. Rep. 2d 235, affirmed on this point,127 N.J. Law 35, 21 Atl. Rep. 2d 323. If the gift would not have been made in the absence of such a purpose, the gift is taxable as made in contemplation of death, (i.e., as a substitute for testamentary disposition). Schweinler v. Martin, supra, atp. 95, bottom; Nicholas v. Martin, 127 N.J. Law 35,21 Atl. Rep. 2d 323.
It has been said by this court, (cf. Schweinler v. Martin,supra, at p. 97, and Nicholas v. Martin, supra, at p.347) that if a donor, in determining to make an inter vivos
gift, has made a conscious and considered choice between benefaction by will and benefaction by present gift, the gift is the *Page 323 
result of that kind of contemplation of death which leads to testamentary disposition, and is a substitute for testamentary disposition and is taxable. This statement, — without additional explanation or qualification, — is doubtless too broad. The statement is accurate where, — but only where, — the controlling purpose of the donor is to accomplish that the donee shall have the ownership and enjoyment of post mortem interests in the property.
In order that the gift be taxable, — (when it is made as the result of a considered choice between present gift or testamentary gift), — the donor must have had, in fact, a choice between doing the thing he desired to do by gift and doing it by will. If his controlling desire and purpose was to accomplish benefit to the donee by clothing him with the ownership of thepost mortem interests in the property, he could do that in either of the two ways; he had a real choice between the two methods. If however his controlling desire and purpose was to accomplish a benefit to the donee of a kind which could only be accomplished by a present gift and could not be accomplished by a testamentary gift, — then he had no actual choice, and even if he consciously thought of the fact that he had already made, or could make, a testamentary disposition, he did not make a choice between the two because the chief purpose which he desired to accomplish could be accomplished only in the one way, — by the transfer of the ante mortem interests.
Clarification should doubtless also be made here of what might otherwise seem to be a conflict between what has been said herein as to the necessity of ascertaining the donor's chief or controlling purpose in the making of an inter vivos gift of whole ownership, and what was said in Nicholas v. Martin,supra, (at p. 357, et seq.) to the effect that it is not essential to taxability that contemplation of death be the dominant or controlling cause for the transfer.
It is essential to taxability of an inter vivos gift of whole ownership, that it be a gift in lieu of testamentary disposition; and it is essential, in order that such intervivos gift be one in lieu of testamentary disposition, that the chief or controlling intent and purpose of the donor in the making *Page 324 
thereof, be to accomplish thereby that the donee or donees have the post mortem enjoyment of the property, — to accomplish the disposition of the post mortem interests. In the discussion in the Nicholas Case, at pp. 351-357, it was sought to be shown that the particular transfer there under consideration was clearly a transfer in the place and stead of testamentary disposition; and what was sought to be shown in the discussion atp. 357, et seq. was that if and where an inter vivos transferis in fact a transfer in lieu of testamentary transfer. — if and where a transferor, whose chief concern and purpose is to accomplish that the transferee shall have and enjoy the postmortem interests in property, has made a conscious and deliberate choice of effectuating that purpose by inter vivos
transfer instead of testamentary transfer, — it is of no materiality or consequence why the transferor decided to effectuate that purpose by inter vivos transfer instead of by testamentary transfer.
To explain a little more at length: If A makes an inter vivos
transfer of a remainder subject to a life estate in the transferor, he has made a transfer in lieu of testamentary transfer because it is a transfer, — not merely chiefly, but wholly, — of post mortem interests. Being a substitute for testamentary transfer, it is taxable quite irrespective of the reasons or desires which led him to make any gift at all or which led him to accomplish the transfer of post mortem interests byinter vivos transfer instead of testamentary transfer. If he makes an inter vivos transfer of whole ownership, it is necessary, in order to determine whether or not it is a transfer in lieu of testamentary transfer, to determine whether or not the thing he chiefly intended to transfer was the post mortem
interest. To determine this latter it may be material and important to consider all the various reasons, desires and purposes, (appearing in the evidence) which he had at and prior to the making of the gift, and which might be in any wise related to the making of the gift; but on the other hand it may be of no importance whatever to consider anything other than the things which he actually did.
To illustrate: A, 50 years old, having an estate of $150,000 and desiring to benefit the transferee, makes a transfer of *Page 325 
absolute ownership of securities worth $100,000, taking back in exchange an agreement by the transferee to pay him a life annuity of $5,000 per annum (not derived from or tied up with the securities transferred). This is not a transfer intended to take effect in possession or enjoyment at or after death, — FidelityUnion Trust Co. v. Martin, 118 N.J. Law 277, 192 Atl. Rep. 74;affirmed, *119 N.J. Law 425, 197 Atl. Rep. 40. It is a transfer of immediate possession and enjoyment of ante mortem interests as well as post mortem interests. It is evident however simply from a consideration of the transaction itself, that the chief and important thing which the transferor intended to accomplish by the transfer was that the transferee should thereby have thepost mortem possession and enjoyment of the property. He desired to benefit the transferee, but he also obviously desired to obtain for himself during his life (substantially) the same income he could expect to receive if he retained the securities and bequeathed them to the transferee by will. The ownership, possession and enjoyment of the ante mortem interests in the securities gave little or no net benefit to the transferee. Obviously the chief concern of the transferor was not that the transferee should have such ante mortem enjoyment and possession, which conferred little or no net benefit on the transferee, but that he should have the post mortem possession and enjoyment which would confer real and substantial benefit. The transferor desired to benefit the transferee by making a gift to him; the only thing which he gave, by the transaction, was the post mortem interest in the property, — the ante mortem
interest he did not give but sold. Since the chief thing accomplished, and intended to be accomplished, by the transfer was that the transferee should have the enjoyment and possession of the post mortem interests, the transfer was one which was a substitute for testamentary transfer, and hence taxable under the true intent and meaning of the statute as judicially established.Cf. In re Kellogg, 123 N.J. Eq. 322, at 325-6,197 Atl. Rep. 263. It being thus evident that the transfer was a substitute for testamentary transfer, and hence taxable, the reasons or motives which led the transferor to make the gift by intervivos transfer instead *Page 326 
of by testamentary transfer are unimportant and immaterial. The situation in the Nicholas Case was essentially the same.
On the other hand, if consideration of the transaction itself does not suffice to disclose whether or not the transferor's chief intent in the transfer was to transfer the post mortem
interests in the property, consideration must needs be given to all of the reasons, motives, purposes and desires which appear in the evidence, — in the effort to ascertain this one and only important fact. In so doing, however, it is necessary to make careful analysis and appraisal of the circumstances in the particular case, and to bear in mind that the object of inquiry is not why did the transferor desire to benefit the transferee, nor why (if he did make a gift of that which is essentially apost mortem interest) did he decide to make the gift by intervivos transfer instead of by will, but that the single important question is, — The transferor has made a transfer of whole ownership, which transfers all interests in the property; was his chief concern and intent that this transfer should accomplish that the transferee should have and enjoy the property after the transferor's death? Or was it that the transfer should accomplish a benefit to the transferee of such a kind or nature as could be accomplished only by a present transfer of whole ownership?
To sum up, — an inter vivos gift is "made in contemplation of death," under the meaning and intent of the statute, where although the taking effect thereof in possession or enjoyment is not intended to be postponed until the death of the transferor, the transfer is nevertheless a substitute for testamentary transfer, — where it effectuates the transfer to the donee ofpost mortem interests in property with the intent and purpose that as the result thereof the donee shall have and enjoy, after the death of the transferor, the property transferred or some interest therein, and would not have been made in the absence of such intent.
The paraphrase of the provisions in R.S. 54:34-1, c. for taxation of inter vivos transfers, earlier set forth herein, should be modified so as to read substantially as follows:
"(Tax is imposed, etc.), — Where the transfer is made intervivos as a substitute for testamentary transfer, i.e., where it is intended *Page 327 
to take effect in possession or enjoyment at or after the death of the transferor or is otherwise made as the result of a purpose, (either alone or together with other purposes), that the transferee shall or may have and enjoy, after the death of the transferor, the property transferred or some interest therein, and the transfer would not have been made in the absence of such purpose aforesaid."
So much as to what constitutes a taxable transfer intervivos, — as to what makes an inter vivos transfer a substitute for testamentary transfer.
Whether or not any particular gift inter vivos was a substitute for testamentary gift is of course a question of fact, — a conclusion of fact which is to be drawn from the facts concerning the transfer and the donor's purpose and intent. To justify the imposition of tax it must appear by the evidence that the facts as to the donor's purpose and intent are such that the factual conclusion necessarily or properly to be drawn therefrom, is that the gift is a substitute for testamentary gift.
In order to establish taxability, it is of course not necessary that there be testimony specifically to the effect that the donor did have the intention that the gift should take the place of testamentary disposition; nor on the other hand is testimony specifically that he did not have such intention, controlling or conclusive if there be other evidence to the contrary sufficient to outweigh such testimony. The question of fact is to be determined upon the whole evidence. Purposes and intent are subjective mental states or processes on the part of the donor, and their existence can be determined by others only by inference and deduction from events external to the mind of the donor; and such inferences of fact are frequently of much greater weight than testimony as to statements by the donor himself, or even written statements by the donor himself. Cf. In re Grabfelder,*107 N.J. Law 520, 153 Atl. Rep. 532; State v. Atti,127 N.J. Law 39, at 43-44, 21 Atl. Rep. 2d 603.
Among the facts which are pertinent and material in the establishment of the donor's mental purpose and intent, and from which inferences of fact in that behalf may properly be drawn, are the donor's age, his condition of health and his knowledge thereof, the amount of the gift, and the provisions *Page 328 
in his will. In a particular case, those facts may be such that it is an inescapable inference or deduction therefrom, that the donor's chief concern was to transfer to the donee the postmortem ownership and enjoyment of the property, and hence that it was intended in substitution for testamentary disposition, — notwithstanding a contradictory contemporaneous statement by the donor as to his purpose and intent. Cf. In re Grabfelder,supra. In other cases those facts may be such that the natural and proper inference and deduction therefrom is that the donor's chief concern was not that the donee should have the postmortem enjoyment of the transferred property; and in still other cases it may be entirely doubtful as to which of the two inferences is the more probable and justifiable.
The burden is always on the state to establish taxability, — to prove by the preponderant weight of the evidence, that the donor's purpose and intent was to provide that the donee should have the post mortem ownership and enjoyment of the property. Where the gift is made less than two years prior to the donor's death, the statutory presumption provided for in the second paragraph of subsection c. of R.S. 54:34-1 arises upon proof by the state that the transfer was a gift and was of a material part of the donor's estate, and this casts upon the taxpayer the duty of going forward with evidence to rebut the presumption; but of course in every case, the burden of proof is upon the state, on the whole case.
The question before the Commissioner therefore was a question of fact, — were the gifts in question, in fact made by the donor intentionally in the place and stead of testamentary disposition? Is it a fact that he made them as the result of a controlling purpose (inter alia) that the donees should have and enjoy the property given, after the death of the donor, and would not have made them in the absence of such purpose?
The essential question of fact is to be determined upon the whole evidence; and the whole evidence includes not merely the specific testimony and evidence but also such inferences and conclusions of fact as are natural and proper to be drawn from the facts specifically in evidence. Kellogg, *Page 329 Executrix, v. Martin, (decided contemporaneously herewith; not yet reported) and cases cited.
The question presently before this court therefore is, — was the evidence specifically before the Commissioner, together with the inferences and conclusions of fact natural and proper to be drawn from such specific evidence, such as to establish by the preponderance of the weight thereof, that the donor's chief purpose and intent in the making of the gift was that it should thereby be accomplished that the donees should have the ownership and enjoyment of the property after the donor's death; and that the gift would not have been made in the absence of such purpose?Kellogg, Executrix, v. Martin, supra.
In the instant case the evidence shows that the transfer (considering the two simultaneous transfers to the two sons as a single transfer) was made without adequate, — indeed withoutany, — valuable consideration; and that it comprised a material portion, — nearly half, — of the donor's estate. If it had been made within two years prior to the donor's death, then by the force and effect of the fifth paragraph of R.S. 54:34-1, those three facts would have established, prima facie, that the transfer was made "in contemplation of death," — (i.e., in lieu of testamentary disposition), — and in the absence of evidence of equal or greater weight to the contrary effect, would have established it conclusively.
The statutory provision just mentioned does not say, and does not mean, that a transfer without consideration of a material portion of the donor's estate, is not to be deemed to have been made in contemplation of death unless it was made within two years prior to the donor's death. It simply establishes a primafacie case by presumption, under the circumstances mentioned, and casts upon the taxpayer the duty of presenting some evidence tending to prove the contrary, — in the absence of which the fact that the transfer was made in contemplation of death, — (in lieu of testamentary disposition), — will have been duly and sufficiently established.
Where the transfer was made more than two years prior to the transferor's death, the presumption that the transfer *Page 330 
was made in contemplation of death does not automatically arise by operation of law from the existence of the facts that the transfer was without consideration and was of a material portion of the donor's estate (or was in the nature of a final disposition or distribution of the portion transferred); but those two facts are, nevertheless, important factors to be considered in arriving at a conclusion on the question of fact as to whether or not the transfer was made with the conscious intention that it be in place of a testamentary disposition. Other things being equal, the possibility or likelihood that a gift was made in lieu of testamentary disposition increases or decreases with the age of the donor and with the amount of the property so given. See Schweinler v. Martin, supra, at p.82.
In the instant case, in addition to the facts that the transfer was of nearly half the donor's estate and without any consideration, the evidence also shows that notwithstanding the donor was in excellent health and physical condition and had no apprehension of death, nevertheless he was over 83 years of age at the time; that only two weeks prior to the making of the gifts he had executed a new will whereby he gave his whole estate equally to the two sons (the donees of the subsequent transfer); that at the same time as the transfer, he sold and conveyed to his son Edward, all his (the father's) interest in the manufacturing business which he, solely, owned and which had been his life's work and interest; and that prior to the making of the gifts he had computed the amount of his property which it would be essential for him to retain in order to have a sufficient income to maintain himself, and then determined the amount of the gifts accordingly.
From these established and uncontroverted circumstances, — without more, — it would seem to follow as a natural, logical, probable, and therefore proper, inference and conclusion (as will hereinafter be shown), that he made the gifts with the conscious intent that they be in place and stead of testamentary disposition, — that his chief intent and purpose in the making thereof was to accomplish thereby that the donees would have the enjoyment of the property after his death, — hence that they were made in contemplation of death under the statute. *Page 331 
It is of course a necessary and inescapable conclusion, from the fact of his making his new will, that at that time he had that contemplation of death which results in testamentary disposition; that his chief, — indeed his only, — intent and purpose in the making of gifts to the two sons in and by the will was to accomplish thereby that they should have the post mortem
interests in his property. It is in the highest degree probable, and therefore a proper inference and conclusion, that when he made the inter vivos gifts, only two weeks after executing this will, he remembered and had in mind the fact that he had executed this will and the provisions thereof, — and hence that at the time he made the gifts he knew and had in mind that he was thereby giving to the donees half the property which he had just previously provided should go to them at his death, — hence also that in determining to make the inter vivos gift he made a conscious and considered choice between giving that half of his property to the donees by will or giving it to them by present gift. This last conclusion is corroborated to the point of practical, if not an absolute, certainty, when it is considered that that which he then determined to give, and did give, was the balance of his estate over and above the amount which he had calculated he would need to retain for the purpose of his own satisfactory maintenance for the rest of his life, and that he determined to give up control of his business and contemporaneously sold and transferred his interest therein, thus tending to avoid the risk of loss of principal or income attendant upon the investment of his assets in that business over which he had determined to give up control and ownership.
What caused the donor to decide to give this half of his property, to his two sons by present gift instead of by will? The specific testimony before the Commissioner establishes that this determination (so far as concerns the share given to Clifford) was caused by the argument and persuasion of the son Edward; that two or three years earlier Clifford had lost his job, had become in need of financial assistance and had applied to his father for such assistance from time to time; that the father had given him money on these occasions, but reluctantly and in small amounts (feeling that *Page 332 
Clifford was at fault in not having saved up something for possible bad times); that at the time of the making of the intervivos gifts in question Clifford had obtained a job although it was one which was not greatly remunerative and he still needed some assistance for his proper maintenance and support, and came to his father therefor from time to time; that Edward had repeatedly urged his father to make a gift to Clifford of substantial amount so that the latter could obtain out of the income therefrom the additional financial assistance he needed and would not have to humiliate himself by the repeated calls upon the father and the disagreeable circumstances incident thereto; that Edward was fairly successful and well off, and was not in need of, and did not ask for any financial assistance for himself; that the only purpose or reason on the part of the donor for the making of the gift to Edward was that of treating both sons substantially alike; that before making the gifts the donor went over his assets, computed the amount he estimated would be required to afford himself satisfactory maintenance and support for the rest of his life; and that contemporaneously with or as a part of the whole transaction, he sold and conveyed to Edward the business which up to that time he (the donor) had solely owned and controlled.
It is the view of this court, as it was the view of the Commissioner, that it appears highly probable, — if not indeed a practical certainty, — from the facts thus specifically in evidence, — that the donor's chief purpose and concern in the making of the gifts to the two sons, was to accomplish thereby the transfer to them of the post mortem interests in the property transferred, — the ownership and enjoyment of that property after the donor's death, and that he would not have made the gifts in the absence of such purpose and intent; that if he had not had the purpose and intent in the making of this gift, that there would thereby be accomplished the result that the sons would have and enjoy the property after his death, he would not have made it, — he would have effectuated his desire and intent to increase the present income of the sons by a method other than the present gift of whole ownership. *Page 333 
He had had for a considerable number of years the purpose and intent that the two sons should have the ownership and enjoyment of his estate after his death. This is evident from the fact such was the provision in the will executed some years prior to 1935. Such was also the provision in the new will executed October 4th, 1935; ergo, he had the same purpose and intent at that time. He made no change in his will at or after the making the gifts on October 18th, 1935; it is a logical conclusion therefore that at that time when he made the gifts, not only did he still have the purpose and intent that the sons should have the ownership, after his death, of that half of his property not comprised in the gifts, but also that they should have, (as the result of the gift), the ownership and enjoyment after his death, of the property thus given, — which post mortem interest would be, was intended to be, and was, transferred to the sons in and by the gifts.
It is quite clear of course that in the making of the gifts he also had the intent and purpose of thereby accomplishing that the sons should have the ante mortem interests in the property, — the enjoyment of the income from the property given, for the donor's life; because it appears that he had finally come to the conclusion and determination, (as the result of Edward's arguments and urging) that he should and would make some general provision for Clifford's benefit which would increase Clifford's present income sufficiently to take care of Clifford's financial needs which arose out of his loss of his present job and the low remuneration received from his present and temporary job; that he could make such provision by making a present gift of such substantial amount that the income therefrom would be ample to supplement Clifford's own earnings; and that he would
make such provision, by making such present gift of substantial amount instead of by giving Clifford a regular monthly or annual allowance or making a trust from which Clifford should receive the income.
It is evident, then, that in the making of the gifts (so far as Clifford was concerned) the donor was actuated by two purposes and intents, — one that Clifford should have the ante mortem
enjoyment of, — (the income from), — the property, *Page 334 
and the other that he should have the ownership and enjoyment of the property after the donor's death. Which of these two was hischief purpose? Would he have made the inter vivos gift in the absence of the latter purpose? Cf. Kellogg, Executrix v.Martin, supra. Consideration of the evidence leads this court to the conclusion that it is probable, if not practically certain, that the latter purpose was his chief purpose, and that in the absence of that purpose he would not have made the gift.
As has hereinbefore been seen, the donor had had for a considerable number of years the definite desire, purpose and determination that his two sons should have and enjoy his estate, after his death, in substantially equal shares. This was a firm and definite purpose, subject to no hesitation or doubt, and this purpose so continued to exist at the time of the making of the gifts, because he neither then nor thereafter made any change in the provisions of his will and the gifts were, and were intended to be substantially equal, (without going into details, it appears that the donor's reason and purpose in giving some $6,000 more to Edward than to Clifford was that he thought this would put them both on a substantially equal basis, because he had made a prior gift to Clifford without making any gift to Edward). His decision and determination to give to Clifford any ante mortem
interest in that property, — any enjoyment thereof during the donor's lifetime, did not exist or arise until at or immediately prior to the making of the gifts. Prior to that time such purpose and intent not only had not existed, but he had had an intent and purpose directly to the contrary, — i.e., that he would not
give to Clifford any ante mortem interest or income therefrom during his (the donor's life); and his ultimate decision and purpose to give such an ante mortem interest to Clifford was arrived at slowly and reluctantly and only as the result of argument and persuasion by Edward. Furthermore it appears that Clifford's financial necessities were greater a year or two before the gifts, than at the time the gifts were made; also that his financial condition was not such as to require the income from a sum as large as $40,000. Clifford had no child, and his wife having recently *Page 335 
died, he had no one but himself to maintain and support. It is surely a natural, probable and logical conclusion that the desire and purpose that Clifford should have the post mortem interest in the property was stronger and more important to him than the intent and purpose that Clifford should have the ante mortem
enjoyment; and that he would not have made the inter vivos gift (of whole ownership) to Clifford if he had not had the desire and purpose that Clifford should enjoy the property after his death, — would not have made such gift of whole ownership if, for instance, he had deemed it likely that Clifford would lose or squander it during his (the donor's) lifetime and so would not have the post mortem ownership and enjoyment. This is further very strongly corroborated by the fact that in connection with, or as the result of, his consideration and determination as to giving assistance to Clifford prior to his (the donor's) death, he considered (as appears by the evidence) the giving of such assistance to Clifford by the method of establishing a trust, from which Clifford should receive the income (or a part thereof). Such a transaction would obviously have precluded anyante mortem loss or squandering or use of the principal orpost mortem interests by Edward; and it further appears that he was dissuaded from such a course and led to decide upon transferring to Edward the post mortem interest which he desired him to have and the ante mortem interest which he was willing for him to have, by the means of the inter vivos gift of whole ownership, because of the advice of his lawyer that the total aggregate income taxes payable on his then present estate would be lowered as the result of such a course and that this would not be true either if the suggested trust were established or if the donor simply made to Clifford some annual allowance out of his (the donor's) income.
Obviously it was not necessary for the donor to make a present gift of whole ownership to accomplish the two purposes he had — to wit, the purpose that Clifford should have the ownership and enjoyment of the property after the donor's death, and that Clifford should have an income (in addition to that which he already had or might have from his own earnings) during the period prior to the time when he should *Page 336 
receive the property at donor's death, i.e., for the donor's life. He could have accomplished these two purposes either by theinter vivos gift which he actually made, or by establishing a trust under which Clifford would get an income for life and the principal at donor's death, or by giving Clifford an annual allowance during his (donor's) life and a half interest in his estate at his death, by his will, as he had already provided. He did not have a purpose which could only be effectuated by a present gift, — such as would be the case if he desired to make a gift so that Clifford could get married and embark in business. He had a choice of accomplishing that Clifford should have the ownership and enjoyment of half the estate at his death, (and at the same time accomplishing that Clifford should have an increased income prior to donor's death) between giving it to him by will and giving it to him by present gift; and he considered and deliberated upon that choice; hence when he chose the latter course or method, and carried out that choice, he made a gift in the place and stead of testamentary disposition, and the gift is taxable under the statute. Kellogg, Executrix, v. Martin,supra.
This being so, the reason why he made that choice is immaterial. Kellogg, Executrix, v. Martin, supra. It may be mentioned, however, that it is a proper and logical conclusion from the evidence, that the reason why he made the choice was because, by utilizing the method of present gift, the total aggregate income tax would be lessened. Obviously that was not his sole or main purpose for making the transfer; it was his purpose in making the transfer by present gift instead of bywill. He would never have transferred property away from himself for the sole purpose of accomplishing that the tax on the income from that property should be reduced; his main purpose in making the transfer was to benefit the transferee, and if the transfer had not accomplished that, he would not have made it. Furthermore, it is definitely established that the existence of such a subordinate and incidental purpose as the saving of income taxes does not prevent the gift from being one in contemplation of death — a substitute for testamentary transfer. In reGrabfelder, *107 N.J. *Page 337 Law 520, 153 Atl. Rep. 532. Neither, of course, would the existence of a purpose to save inheritance taxes, (as to which there is no evidence in the present case). That would simply still more definitely establish that the gift was made in the place and stead of testamentary disposition.
It may not be amiss to mention that all of the testimony and evidence in the case (except some evidence as to value) was that which was submitted by the two sons themselves.
Turning now to the reasons for, and purposes of, the gift to Edward, — it is of course clear that the donor had precisely the same desires, reasons and purposes with regard to transferring to Edward the post mortem ownership and enjoyment half his estate, as he had in respect to Clifford. As to the gift to Edward of anything other than such post mortem ownership, — it appears by the evidence that the reason therefor was either the desire and purpose of treating Edward substantially the same as Clifford, or the desire and purpose that Edward should have an increased income prior to the donor's death (because although Edward had told his father he did not desire any gift to himself, yet his father knew that he had a wife and four children to support and the children to educate and was therefore under heavy expense even though not in actual need of financial assistance), — or both. It is evident, therefore, that the donor's intents and purposes in regard to the gift to Edward were the same as those in regard to the gift to Clifford, i.e., his main intent and purpose was that Edward should have the post mortem ownership and enjoyment of half the estate, and he had the less strong or important intent and purpose of giving Edward additional income at the present time and prior to the time when Edward would at the father's death come into the ownership and enjoyment of thepost mortem interests in the estate, under the testamentary provision then already made. The purpose as to the post mortem
estate could be accomplished either by will, or by trust or by present gift. The purpose as to present additional income could be accomplished without making a present gift of whole ownership. He made a considered and intentional choice to make the transfer of ownership of the post mortem estate by present gift instead of by *Page 338 
will. He had an incidental and subordinate intent and purpose to lessen income taxes, but this was not an intent and purpose for the making of the gift, but for the method of the making of the gift.
It is the view of this court, therefore, that the conclusions as to the facts of intent and purpose, hereinbefore mentioned as being drawn from the facts specifically in evidence, are not merely possible inferences and conclusions, but the natural andprobable conclusions to be drawn therefrom; that therefore the conclusion to be drawn from those conclusions of fact, is that the donor's intent and purpose in the making of the gift, was, — in so far as concerns the post mortem interests in the property given, — to make the inter vivos transfer of such post mortem
interests in the place and stead of a testimentary transfer thereof; and hence such transfer of such post mortem interests was "made in contemplation of death" under the intent and meaning of the statute, and taxable at the death of the donor.
The tax will be affirmed.