FIDELITY UNION TRUST COMPANY, AS EXECUTOR AND TRUSTEE UNDER THE LAST WILL AND TESTAMENT OF FREDERICK K. DAY, DECEASED, PROSECUTOR-APPELLANT, v. J. H. THAYER-MARTIN, STATE TAX COMMISSIONER, DEFENDANT-RESPONDENT.

FIDELITY UNION TRUST COMPANY, AS EXECUTOR AND TRUSTEE UNDER THE LAST WILL AND TESTAMENT OF FREDERICK K. DAY, DECEASED, DEFENDANT-APPELLANT, v. J. H. THAYER-MARTIN, STATE TAX COMMISSIONER, PROSECUTOR-RESPONDENT.

IN THE MATTER OF THE INHERITANCE TAX IN THE ESTATE OF FREDERICK K. DAY, DECEASED.

Submitted January 19, 1937—Decided May 12, 1937.

Before BROGAN, CHIEF JUSTICE, and Justices CASE and PERSKIE.

For the appellant, *Hood, Lafferty & Campbell* (*Harry Schaffer,* of counsel).

For the respondent, *David T. Wilentz,* attorney-general (*William A. Moore,* of special counsel).

The opinion of the court was delivered by

PERSKIE, J. Are the gifts of decedent (concededly not made in contemplation of death), taxable on the ground that they constituted transfers intended to take effect in possession or enjoyment at or after his death? Were the gifts supported by such adequate valuable consideration as to take the full value of each transfer, or a portion thereof, out of the taxable class? If so, how is the amount of that consideration to be determined? These are the questions presented, and requiring decision, in the two causes which are consolidated by stipulation of counsel for the respective parties.

In case No. 13856, the Fidelity Union Trust Company, as executor and trustee in the last will and testament of Frederick K. Day, is the prosecutor, and shall be hereafter referred to as "Trust Company," and in case No. 13859 the state tax commissioner is prosecutor, and shall be hereafter referred to as "Commissioner." The third caption follows the practice in the Prerogative Court; it identifies the estate involved, and facilitates the proper reporting of the cause.

Frederick K. Day, a resident of Elizabeth, New Jersey, died on January 15th, 1932. Between May 28th, 1926 (he was then about seventy-eight years of age) and May 3d, 1930, he made twenty-eight transfers, evidencing gifts of money to various religious, bible and tract societies or organizations, totaling $196,000. Each transfer was effected by a written instrument ("annuity bond or agreement") wherein the donees agreed, in effect, that in consideration of, and exchange for, the specific sum transferred to it, to pay the donor an annual sum for life. The amount of each annuity is not the

same; it is variously based on percentages, ranging from six to nine and four-tenths per cent., of the respective sums transferred.

The date of each instrument, the name of each donee, the amount of each gift, the specific annuity, are as follows:

(a) American Bible Society of New York, dated January 17th, 1930, gift of $10,000, annuity of $900 for life.

(b) American Bible Society of New York, dated April 4th, 1929, gift of $10,000, annuity of $900 for life.

(c) American Bible Society of New York, dated May 28th, 1926, gift of $3,000, annuity of $264 for life.

(d) American Tract Society, dated July 24th, 1929, gift of $5,000, annuity of $450 for life.

(e) Board of National Missions, Presby., dated July 3d, 1929, gift of $10,000, annuity of $860 for life.

(f) Philadelphia School of the Bible, dated May 29th, 1926, gift of $3,000, annuity of $270 for life.

(g) Stony Brook Assembly, Incorporated, dated April 5th, 1929, gift of $10,000, annuity of $860 for life.

(h) Stony Brook Assembly, Incorporated, dated June 15th, 1926, gift of $3,000, annuity of $249 for life.

(i) Bible Institute of Los Angeles, dated July 2d, 1929, gift of $5,000, annuity of $455 for life.

(j) Bible Institute of Los Angeles, dated July 6th, 1929, gift of $7,000, annuity of $637 for life.

(k) Board of Foreign Missions, Presby., dated July 3d, 1929, gift of $10,000, annuity of $860 for life.

(l) Christian and Missionary Alliance, New York, dated April 1st, 1929, gift of $10,000, annuity of $800 for life.

(m) Christian and Missionary Alliance, New York, dated November 6th, 1929, gift of $5,000, annuity of $400 for life.

(n) Evangelical Theological College of Dallas, dated May 3d, 1930, gift of $10,000, annuity of $900 for life.

(o) Evangelical Theological College of Dallas, dated June 4th, 1926, gift of $3,000, annuity of $255 for life.

(p) Evangelical Theological College of Dallas, dated April 8th, 1929, gift of $10,000, annuity of $900 for life.

(q) Moody Bible Institute of Chicago, dated June 5th, 1926, gift of $3,000, annuity of $264 for life.

(r) Moody Bible Institute of Chicago, dated April 16th, 1929, gift of $10,000, annuity of $920 for life.

(s) Moody Bible Institute of Chicago, dated January 31st, 1930, gift of $10,000, annuity of $940 for life.

(t) National Bible Institute of New York, dated May 28th, 1926, gift of $3,000, annuity of $264 for life.

(u) National Bible Institute of New York, dated April 24th, 1929, gift of $10,000, annuity of $900 for life.

(v) American Mission to Lepers, Incorporated, dated July 23d, 1929, gift of $5,000, annuity of $430 for life.

(w) Bible Institute of Los Angeles, dated June 2d, 1926, gift of $3,000, annuity of $255 for life.

(x) Oriental Missionary Society, dated July 9th, 1929, gift of $10,000, annuity of $800 for life.

(y) Wheaton College, dated June 10th, 1926, gift of $3,000, annuity of $240 for life.

(z) Wheaton College, dated April 1st, 1929, gift of $10,000, annuity of $800 for life.

(aa) Eliada Orphanage and Rescue Home, dated April 1st, 1929, gift of $10,000, annuity of $600 for life.

(bb) Eliada Orphanage and Rescue Home, dated July 22d, 1929, gift of $5,000, annuity of $300 for life.

In addition to the foregoing data concerning the gifts, it may be advisable, in light of its controlling importance, even though it may protect this opinion, further to amplify that data as to variations in the provisions of the several bonds or agreements with respect to income and *corpus*. A detailed exhibit, dividing the gifts into five groups, appears in the brief of the attorney-general (between pages 6 and 7) for the commissioner. They are grouped as follows:

"Group No. 1, covering gifts (a to h, inclusive) totaling $54,000, involved eight annuity agreements wherein there is no mention of the yearly sums reserved as being interest on the funds transferred and wherein no provision has been made for the suspension of the vesting of title to the gifts until the donor's death, or for the use of the funds transferred as a guarantee for the payment of the annuities.

"Group No. 2, covering gifts (i to u, inclusive) totaling $96,000, involves thirteen annuity agreements wherein there is no mention of the yearly sums reserved as being interest on the funds transferred, but wherein it is specifically provided that the gifts are either 'subject to the agreement hereinafter expressed,' or 'upon the terms aforesaid.'" (That is, in effect, to pay the annual sum therein mentioned.)

"Group No. 3, covering gifts (v to w, inclusive) totaling $8,000, involves two annuity agreements wherein there is no mention of the yearly sums reserved as being interest on the funds transferred, but wherein it is specifically provided that the gifts are either not to be devoted to the general uses and purposes of the donee until maturity (viz., the date of the death of the donor), or wherein it is provided that all obligation to return any portion of the gifts in installments, or otherwise, does not cease until the death of the donor.

"Group No. 4, covering gifts (x to z, inclusive) totaling $23,000, involves three annuity agreements wherein the annuity guaranteed is referred to either as interest or income on the fund donated, and further, that the gift is subject to the 'payments aforementioned' or that the 'obligation' under the agreement does not cease until the donor's death.

"Group No. 5, covering gifts (aa to bb, inclusive) totaling $15,000, involves two annuity agreements wherein it is specifically provided that the annual payments thereunder, which are at the rate of six per cent. per annum, are 'interest on the principal,' but wherein there is no provision as to *corpus* which could possibly be construed as suspending the the vesting of title to the gift until at or after the death of the donor."

The commissioner determined that all of the aforesaid bonds or agreements constituted taxable transfers of gifts, and while those transfers were not made in contemplation of death, yet, they were made by the decedent to take effect in beneficial possession and enjoyment after his death, and, therefore, were properly taxable against his estate. Section 1, subsection 3, chapter 228, *Pamph. L.* 1909, *p.* 325, as amended by chapter 303, *Pamph. L.* 1931, *p.* 749.

The Trust Company appealed to the Prerogative Court from the assessment thus made. Generally stated, that appeal was rested on the grounds that the transfers in issue were not intended to take effect in possession or enjoyment at or after the death of deceased, and, therefore, were not taxable; and, even assuming that they were so intended, nevertheless, they were supported by such adequate valuable consideration so as to take them out of the purview of the statute.

The vice-ordinary had, at the time, before him the matter of the estate of Laura H. Ellis, deceased. We are told by the vice-ordinary that the issues in the instant case are "practically identical with those in the appeal in the Ellis case." A study of the conclusions reached in the Ellis case, and the conclusions reached in the instant case, both of which are marked "not for publication in any report," discloses that the argument advanced for the commissioner in both cases is substantially the same, and that the determination of the question here first stated was chiefly based upon the decision of our Court of Errors and Appeals in the case of *In re Harvey's Estate,* 2 *N. J. Mis. R.* 247; 129 *Atl. Rep.* 393; affirmed, sub nom.; *Moore* v. *Bugbee (Supreme Court),* 3 *N. J. Mis. R.* 435; 128 *Atl. Rep.* 679; affirmed, 102 *N. J. L.* 720; 135 *Atl. Rep.* 919; writ of error dismissed, 278 *U. S.* 565; 73 *L. Ed.* 509; 49 *S. Ct.* 36, hereafter referred to as the Harvey case; and, upon the decision of the same court in the case of *In re Honeyman's Estate,* 98 *N. J. Eq.* 638; 129 *Atl. Rep.* 393; affirmed, sub nom.; *Bugbee* v. *Board of Home Missions of Presbyterian Church (Supreme Court),* 4 *N. J. Mis. R.* 99; 131 *Atl. Rep.* 924; affirmed, 103 *N. J. L.* 173; 134 *Atl. Rep.* 915, hereafter referred to as the Honeyman case.

On the authority of the aforesaid cases the vice-ordinary concluded in the instant case that:

"* * * As to the first eight transfers [a to h, inclusive] the annuity agreements made no mention of the yearly sums [agreed to be paid to the donor] as being interest on, or income from, the sums given by the donor; they are simply promises to pay the fixed yearly sum. Neither do they con-

tain any provision in anywise suspending or delaying the immediate transfer of full and unconditional beneficial ownership of the sums given. These transfers are therefore not taxable, under the Honeyman case; and the taxes assessed in respect thereof must be set aside *in toto*.

"Transfers 'aa' and 'bb' involve agreements which specifically designate the annual payments, which are at the rate of six per cent. per annum, as being 'interest on the principal' of the sums given; although there is no provision otherwise suspending or delaying immediate vesting in the donee of full ownership of the gift. These transfers are taxable, under the Harvey case.

"Transfers 'i' to 'u,' inclusive, involve agreements which in nowise designate the yearly sums as interest or income on the sums given, but which provide that the sums given are made as 'absolute gifts, subject only to the agreement hereinafter expressed' [*i. e.,* the agreement to pay the annuity], or words of like effect. This language indicates that the gift does not become completely operative to transfer full and unconditional beneficial ownership to the donee, until the agreement to pay the annuity has been performed—which would be at the donor's death; until that time the effectiveness of the gift is subject to and conditioned upon the payment of the life annuity, and remains incomplete. So much of the subject-matter of the gift as is represented by the life annuity, for the payment of which the subject-matter is, in effect, made security, is thus withheld from the donee until the donor's death; and this interest thus withheld exceeds the normal income from, or value of the enjoyment of, the subject-matter of the gift. These transfers are taxable under the Harvey case.

"Transfers 'v' and 'w': in these the annuity agreements do mention the annual sums as interest or income of the gifts, but they provide either that the gift is not to be devoted to the general uses and purposes of the donee 'until maturity,' *i. e.,* the date of the donor's death, or that all obligation to return any portion of the gift in installments or otherwise. does not cease until the death of the donor. These are, there-

fore, substantially of the same nature and effect as the transfers just previously mentioned, and are likewise taxable.

"Transfers 'x,' 'y' and 'z' involve agreements which refer to the annual payment specifically as being interest or income of the principal of the gift, and which also contain provisions of the nature set forth in the two preceding paragraphs thereof. These transfers are therefore taxable."

He also concluded that as to the twenty transfers held to be taxable the commissioner erred in that "there had been no deduction made for the value of the consideration received by the transferor—the difference between the amount of annuity given back and the amount of income which would normally have been derived by the donor for the money given." He decreed that the record be remanded to the commissioner to the end that the amount of the taxes be corrected accordingly.

The decree, however, provides that the value of the consideration received by the transferor be determined upon "the value of the annuity given back to the decedent by the recipient at the time of the making of such transfer." This obviously does not follow his conclusions. The vice-ordinary pointed out this fact in his letter to counsel for the respective parties, and added the further fact that while it was too late to alter the decree, writ of *certiorari* having been allowed to each party, yet, the decree should be altered to conform to his original conclusions, and, that, at all events, the language of his opinion should be so altered. He filed supplemental conclusions amplifying and illustrating in principle his original conclusions as to the basic principles for the computation of the value of the consideration received by the donor.

Each party was allowed a writ of *certiorari* by this court to review the results reached in the Prerogative Court.

*First:* For the commissioner it is argued here, as it was argued below, and as it was argued in the Ellis case:

"* * * that the determinations in the Harvey case and the Honeyman case are in fact irreconcilable;' that the distinction made between them in the Honeyman case is unsound —a distinction based on no real or logical difference; that

in actual substance and effect the transaction as to the money gift in the Harvey case was exactly the same as the transaction in the Honeyman case; that either the Harvey gift should have been held not taxable for the reasons stated in the Honeyman case, or the Honeyman gifts held taxable for the reasons stated in the Harvey case; that the latter alternative is the one which should have been adopted, and that a similar course should be adopted in the instant case, and the gifts held taxable for the reasons stated in the Harvey case." And "* * * that a transfer is taxable whatever its form if in substance and effect the donor retains or gets back for life the equivalent of the income or enjoyment of the thing given." *In re Perry*, 111 *N. J. Eq.* 176, and *In re Brockett*, *Ibid.* 183. The argument runs in this vein:

"If the five agreements held non-taxable in the Honeyman case were placed in juxtaposition with the thirteen in Group No. 2 which are held taxable, no perceptible difference would appear. In fact, and as paradoxical as it may seem, of the five agreements held exempt in the Honeyman case, three were of the Board of Foreign Missions of the Presbyterian Church, while an agreement of the same board (k), identical in every essential detail, is one of the thirteen in Group No. 2 held taxable. Obviously any rule which is so fickle as to produce such a result is unworkable in the practical administration of a tax law." And, "* * * the importance of this litigation is not to be found in the $9,800 of taxes involved, but in the settling for the future of the questions as to whether transfers of this character are taxable or exempt." And, "far more important is the establishment of a uniform rule under which it will be possible to determine whether such transfers are, in fact, exempt or taxable. The line of demarcation between taxability and non-taxability is now so finely drawn that, in so far as the practical application of the law is concerned, it is impossible for anyone to say whether such transfers are on one side of the line or the other." And, "that agreements of the type here involved, in substance and practical effect, are all alike, and, therefore * * * are either exempt or taxable."

For the Trust Company it is argued (pursuant to fundamental principles) that the act should be construed strictly and against the taxing authority, for the burden of taxation rests upon the state; that in case of doubt the taxpayer is entitled to the benefit thereof. Upon that basis it is further argued that the answers to the questions here involved are not dependent entirely upon the holding in the Harvey and Honeyman cases; that the answers depend rather upon the intent of the legislature, the historical background of the act (our act is a prototype of the New York act), and the construction given to that act by the courts of the great majority of the states which have a like statute.

In support of that argument an analysis of the holding by the courts of the great majority of our sister states is made and from that analysis the following principles are deduced and urged:

1. "Where by the transfer the donor either through a trustee or through a direction to the donee retains for life the income *qua* income from the property transferred, the donor's interest is fully and completely dependent upon the property transferred or identifiably tied up with it, and the possession or enjoyment of said property is never obtained by the donee in individual capacity inasmuch as the direction to pay the specific income of said property in reality imports a trust, and consequently, possession or enjoyment of the property cannot pass to the donee individually until the donor's death. Such transfer is clearly taxable.

2. "Where by the transfer the donor surrenders all control over the property transferred so that the transferee is not obligated to keep said property for the payment of the sum specified, but may exercise full dominion and control over it by selling, assigning or otherwise disposing of it and is obligated to pay the sum specified whether he actually receives income or not from the transferred property, or whether the property becomes worthless or not, *i. e.,* where the donee's obligation is absolutely fixed and independent from the property and enforceable no matter what may happen, so that the donor has only a right *in personam* against the donee rather

than a right *in rem,* the transfer is direct, complete, immediate and absolute and becomes immediately operative to divest the donor of all right, title and interest in the property transferred. Such transfer is exempt."

It is further argued, and we think correctly so, that the holding in the Perry case does not trench upon the holding in the Honeyman case. The two cases are clearly distinguished by the vice-ordinary. It is finally urged that the holding in the Honeyman case is not in conflict with the holding in the Harvey case, and the former should control. And speaking to the parenthetical clauses, concerning the gifts of that case one of which resulted in making the transfer taxable, it is said that if the distinction made, and characterized as a refinement in language only, be disregarded and struck down much, if not all, of the existing confusion would be eliminated.

The issues are obviously of great importance, and are not free from difficulties. No one will gainsay that it would be desirable, if possible, to have a fixed formula (a *pro forma* method) by which all cases of this character might be decided. But the obvious difficulty is that the court is called upon to decide the intended effect of a transfer. Was it or was it not intended to take effect in possession or enjoyment until the transferor's death? That determination necessarily must be based upon the facts and circumstances connected with each transfer. While the argument of respective counsel is thorough and able, yet, the answers to the stated problems here involved are not of first impression.

Of course, if the principles pronounced in the Harvey case and those pronounced in the Honeyman case are irreconcilable—the latter being the later case would control. But, we concur in the view of the vice-ordinary, who wrote the conclusions in these cases, that they are distinguishable. Speaking to the Honeyman case, the vice-ordinary, in his conclusions in the Ellis case, points out the basic distinction between the two cases.

"This court [Prerogative Court] held the gifts [with one exception] in the Honeyman case not taxable, that the

promise of the donee to pay to the donor for life a certain annual sum was entirely separate from and independent of the thing actually transferred; that the transfer was absolute and immediate, without restriction or encumbrance from the very moment of the transfer; that the donee's enjoyment of the thing transferred was in nowise delayed until the donor's death, notwithstanding that as the result of the transaction the donee's entire net income might be in nowise increased but even decreased until the donor's death; that in order for such a transaction to be a taxable transfer there must be some condition, reservation or provision by which some interest in, or identifiably tied up with the very thing transferred, is reserved from the donee until the donor's death; *distinguishing the Harvey case because there the donee's promise was expressly to pay interest on the very sum given and the transaction amounted in substantial effect to a loan at interest for the donor's life and beneficial gift thereafter."*

The Court of Errors and Appeals adopted that distinction. In each case, it affirmed the judgment of the Supreme Court, which in turn, affirmed the decree of the Prerogative Court upon the reasons, *i. e.,* on the opinion, of the vice-ordinary. Notwithstanding all that has been said by counsel concerning these decisions the vice-ordinary was bound by them. So are we. We concur both upon the law, and the results as already stated by the vice-ordinary.

*Second:* Nor do we consider that the question of consideration is an open one. On the contrary, we think it is well settled. "If in exchange for a transfer taxable under the statute the transferor receives the consideration of *actual financial value,* the value of such consideration should be deducted in computing the tax on the transfer." *Cf. In re Kraft,* 103 *N. J. Eq.* 543; 143 *Atl. Rep.* 764; *In re Huggins,* 96 *N. J. Eq.* 275; 125 *Atl. Rep.* 27; *In re Perry,* 111 *N. J. Eq.* 176, 182; 162 *Atl. Rep.* 146. Thus a consideration necessary to take a transfer, or a *pro rata* portion thereof, out of the statute must be of actual financial value. We agree with the construction placed on these gifts for the commissioner, that to the extent that the transferee obligated

itself to pay to the transferor, for life, a stipulated annual amount over and above that which it might normally be expected the transfers would produce, a valuable consideration passed between the parties. Thus, where, as here, the transferees agreed to return to the transferor a sum annually in excess of that which might be normally realized upon the principal amount transferred, such excess has actual financial value and, therefore, should to the extent of that financial value be deducted from the principal amount of each transfer.

*Third:* We also concur in the result reached by the vice-ordinary, and as further amplified and illustrated in principle in his supplementary conclusions, as to the basic principle upon which the actual financial value of the consideration received by the donor for each transfer should be computed. Summarized it may be stated thus: That the consideration of adequate financial value is the amount by which the sum agreed to be paid annually exceeds the sum which the donor would normally receive on the fund commuted as of the date of the instrument of transfer.

For the reasons already stated the cause is remanded to the Prerogative Court, there to be treated consistent with this opinion.