[Civ. No. 13896. First Dist., Div. One. May 23, 1949.]

Estate of IDA HENRIETTA HYDE, Deceased. THE JOHNS HOPKINS UNIVERSITY et al., Appellants, v. THOMAS H. KUCHEL, as State Controller, etc., Respondent.

Clark, Nichols & Morton for Appellants.

James W. Hickey, Richard C. O'Connor and Charles J. Barry for Respondent.

PETERS, P. J.—The Johns Hopkins University of Maryland, and the executor and executrix of the will of Ida H. Hyde, appeal from that portion of the order of the probate court imposing, over their objections, an inheritance tax on certain properties transferred to the university by decedent during her lifetime. Admittedly, no trusts were created by the transfers, inasmuch as Maryland prohibits charitable trusts. The agreements provided that the complete title to the transferred funds was conveyed to the university. The parties concede that the transfers cannot be exempted from tax on the ground that the university is a nonprofit educational and charitable corporation, because such exemption is granted only where the laws of the sister state are reciprocal, and the laws of Maryland are not.

The position of respondent, upheld by the lower court, is that the *inter vivos* transfers in question were gifts made either to take effect in possession or enjoyment at or after death of the donor, or in which she reserved to herself a life interest

or income, and were, therefore, taxable. The appellants contend that the donor reserved no interest in the funds transferred, that the agreements by which the transfers were made not only transferred title to the university but gave it immediate possession and enjoyment of the funds involved, and that they were, therefore, not taxable. It is their theory that the agreements involved amounted to contracts based upon an inadequate consideration to pay the donor an annuity, and that the inheritance tax statute has no application to such contracts.

### Statement of Facts

Ida H. Hyde died in August, 1945, a resident of Alameda County. By her will she left the residue of her estate (such residue being appraised at $14,725.80) to The Johns Hopkins University to be added to the "Ida H. Hyde Fellowship Fund," which she had established by five *inter vivos* transfers. It is the taxability of these transfers that is here involved. Admittedly, an inheritance tax is payable on the right to receive the residue, and no contention is made to the contrary.

The total value of the five transfers is $40,000. The first transfer was made on July 16, 1924, and consisted of mortgages valued at $20,000. An agreement was entered into on that date signed by decedent and by the proper officials of the university. The "whereas" clause recites that Ida H. Hyde desires "to make a gift or donation" of $20,000 to the university, and that the university "in consideration of said gift" has agreed "to make the semi-annual payments hereinafter agreed to be made to the said party of the second part for and during her life; and after her death to apply the income from said fund as hereinafter provided."

So far as here is pertinent, the agreement then provided:
" . . . in consideration . . . of the payment to it . . . Johns Hopkins University hereby covenants and agrees as follows:

"1. That it will pay to the said Ida H. Hyde, for and during the residue of her life, in semi-annual installments accounting from the date of this agreement, an amount in each year equal to interest at six per cent upon the said principal amount of Twenty Thousand Dollars ($20,000.00) or whatever principal amount is produced from the mortgages herein so donated to it by the said party of the second part.

"2. That from and after the death of the said party of the second part it will use the net income from the fund created by this donation for the purpose of establishing and

maintaining one or more Graduate Medical Research Fellowships for the investigation of the cause and cure of human diseases that await their solution, to be known as the 'Ida H. Hyde Medical Research Fellowship,' or Fellowships.

"3. The party of the first part agrees that it will hold said fund as a permanent endowment fund and keep the same invested in the same class of securities in which similar funds held by it shall be invested; that in no event will it use said fund, or the income therefrom after the death of the party of the second part, for its general purposes or for any purposes other than the purposes hereby agreed."

Paragraph 4 states that it is the wish of Ida that the holders of such fellowships first study the cause and remedy of Parkinson's Disease, but that the particular purpose for which the fund shall be used "must necessarily be left largely to the discretion of the authorities" of the university. Qualifications for holders of the fellowships are set forth, and provisions made for the disposition of the fund if the university should ever be abandoned. The agreement then contained this paragraph, admittedly included on the advice of the university attorneys in order to avoid the Maryland law prohibiting the setting up of charitable trusts: "Nothing in this agreement shall limit or qualify the rights of the party of the first part as the owner of the fund hereby donated, it not being intended by any of the provisions of this agreement to create a trust or to impose conditions upon the title conferred by said donation, but it being intended that the provisions of this agreement shall be construed as covenants or a contract merely, and that in no event shall any possible invalidity of such covenants or contract have the effect of impairing the absolute estate in said fund conferred by said donation; it being the intention of the donor that there shall be no resulting trust in favor of herself, her personal representatives or assigns, because of any such failure, invalidity or unenforceability of any of said provisions, so that the entire beneficial interest shall in such case be in the party of the first part."

On April 26, 1927, Ida made an additional gift of $5,000 to the university, and a supplementary agreement was executed. The supplementary agreement provided that the covenants of the first agreement were made a part of the supplementary agreement, and, in addition, the university covenanted and agreed: "1. That it will pay to the said Ida H. Hyde for and during the residue of her life in semi-annual installments accounting from the date of this agreement an

annuity of Two Hundred Fifty Dollars ($250.00) per annum, this annuity being in addition to the annuity of Twelve Hundred Dollars ($1200.00) hereinbefore referred to and payable under the agreement dated July 16, 1924.''

It was also provided that after the death of Ida the university should add the income from this fund to the 1924 fund for the purposes stated in the 1924 agreement.

On July 26, 1929, without the addition of any further funds, a ''supplemental agreement'' was executed between the parties modifying the 1924 and 1927 agreements to the extent that, after the death of Ida, the university, in any year, was empowered to use 5 per cent of the original principal of the fund to be added to the income for the purposes of the fellowship. The agreement also ''suggested'' that but one fellowship be created.

On January 6, 1931, Ida increased her gift by an additional $5,000, and a supplemental agreement was executed whereby the university agreed to pay to Ida in consideration of receiving this amount an additional ''annuity of Two Hundred and Fifty Dollars ($250.00) per annum.'' The previous covenants were incorporated into this supplemental agreement.

On August 10, 1935, Ida made another gift to the university of $5,000, and another agreement resulted. This agreement seems to supersede the preceding agreements and is not merely supplemental thereto. Among other things, it provides that by a three-fourths' vote of the governing body of the university, 1 per cent of the principal of the fund may be added to the income and paid to the holder of the fellowship. It also contains this paragraph: '' 1. That it will continue to pay to the said Ida H. Hyde for and during the residue of her life, in semi-annual installments, beginning July 16, 1935, an amount in each year equal to interest at the rate of six per cent upon the sum of twenty thousand dollars, and an amount in each year, in semi-annual installments, beginning October 27, 1935, equal to interest at the rate of five per cent on the sum of five thousand dollars, and an amount in each year, in semi-annual installments beginning July 6, 1935, equal to interest at the rate of five per cent per annum on the sum of five thousand dollars; and, in addition thereto, accounting from the date of this agreement, an amount in each year, in semi-annual installments, equal to interest at the rate of four per cent on the principal sum of five thousand dollars.''

On February 1, 1938, another gift of $5,000 was made by Ida and a further agreement was executed. It provides that Ida "will hereafter receive the net income earned by the fund given by her, provided that such amount received by her is not less than four per cent on forty thousand dollars, or sixteen hundred dollars per year." It also provided that clause 1 of the agreement of August 10, 1935, should be modified to read as follows:

"(1) That The Johns Hopkins University will pay to the said Ida H. Hyde:

"(a) Upon execution of this document by both parties, the sum of $233.61, representing unpaid balances accrued to Feb. 1, 1938 on the semi-annual installments stipulated in the Aug. 10, 1935 agreement, after applying the $600.00 installment due Jan. 16, 1938 to provide a part of the last $5,000 gift.

"(b) On May 1, 1938, $400.00, representing accruals from Feb. 1, 1938, to May 1, 1938, at the rate of $1,600.00 a year.

"(c) On Nov. 1, 1938, $800.00, plus any net income in excess of that at the rate of $1,600 a year earned by the fund for the period from Feb. 1, 1938 to June 30, 1938.

"(d) On May 1, 1939 and on each subsequent May 1, during the residue of her life, $800.00.

"(e) On November 1, 1939 and on each subsequent Nov. 1 during the residue of her life, $800.00 plus any net income in excess of $1,600 earned by the fund for the fiscal year ended on the previous June 30."

The final agreement between the parties was executed on October 13, 1941, for the purpose "of modifying the provisions with respect to the payment of an annuity" to Ida. It recites that the university has invested the $40,000 "given to it by the said Ida H. Hyde in its consolidated investment account," and that it is the intention of the parties that "beginning with the payment due May 1, 1942, the annuity payable to the said Ida H. Hyde shall be equal to the net income received by the University on the said fellowship fund as invested."

The parties have entered into a stipulation showing what would have been the cost of an annuity purchased from a life insurance company on each of the dates a transfer was made. The figures show that the cost of an annuity that would have paid Ida the sums required under the various agreements would have been much less than the amounts paid to the university. The State Inheritance Tax Department joined in the stipulation, but objected to its relevancy.

The stipulated facts show that the funds contributed by Ida to the university were not kept separate from other similar funds but were added to the endowment investment fund of the university called a "consolidated investment account," a practice followed by other universities. In order to determine the yield of a particular transfer within the fund, the income of the entire fund is ascertained, and then the proportion which the particular transfer bears to the entire fund is applied to the entire net income. The following chart shows the income actually earned by the money transferred to the university by Ida, from and after 1935, computed according to the above-described method of calculation, and the amounts actually paid to her. Some of this "income" was never paid to Ida but was applied by the university to Ida's later gifts:

| Year (July 1—June 30) | Income Earned | Amounts Paid Ida |
|---|---|---|
| 1935-1936 ................. | $1453.84 | $1744.46 |
| 1936-1937 ................. | 1627.86 | 1900.00 |
| 1937-1938 ................. | 1550.59 | 2033.61 |
| 1938-1939 ................. | 1470.69 | 1600.00 |
| 1939-1940 ................. | 1512.99 | 1600.00 |
| 1940-1941 ................. | 1527.92 | 1600.00 |
| 1941-1942 ................. | 1621.38 | 1621.38 |
| 1942-1943 ................. | 1556.07 | 1556.07 |
| 1943-1944 ................. | 1495.68 | 1495.68 |
| 1944-1945 ................. | 1485.37 | *800.00 |

For the 10 years preceding the times covered by the above chart the payments made to Ida were more than the net earnings from the invested funds, both in every year and *in toto.* In practice, the payments to Ida prior to the agreement of February 1, 1938, were not dependent upon the receipt of any earnings by the consolidated fellowship fund. This is also true as to the minimum fixed payments required to be made under the agreement of February 1, 1938, and to the May 1st payment called for by the agreement of October 13, 1941.

The trial court found the facts as stipulated to by the parties and concluded, first, that Maryland is not reciprocal with California with respect to charities, and second, that the *inter vivos* transfers here involved are subject to an inheritance tax payable by the transferee, the university.

---

*Ida died August 22, 1945, before the November payment was due.

It also fixed the market value of the transferred property at $40,000, and found that the tax on the transfers added to the tax on the residue of the estate valued at $14,725.80 (the tax on the residue is not here challenged) totaled $4,813.60.

### Statutes Pertinent to this Appeal

The main statutory provisions involved are sections 13641, 13643, 13644, 13645 and 13648 of the Revenue and Taxation Code. These sections are found in part 8, entitled "Inheritance Tax"; chapter four, entitled "Transfers Subject to Part"; article 3, entitled "Inter Vivos Transfers." They read as follows:

"§ 13641. *Transfers without consideration.* Any transfer specified in this article made during lifetime by a resident or, if the property transferred is within this State, by a non-resident, by deed, grant, bargain, sale, assignment, or gift, without a valuable and adequate consideration, is a transfer subject to this part.

"[*Consideration defined.*] 'Valuable and adequate consideration' is a consideration equal in money or in money's worth to the full value of the property transferred.

"§ 13643. *Same: Transfers to take effect at or after death.* A transfer conforming to Section 13641 and made with the intention that it take effect in possession or enjoyment at or after the death of the transferor is a transfer subject to this part.

"§ 13644. *Same: Transfers with reservation to transferor of life income or interest.* A transfer conforming to Section 13641 and under which the transferor expressly or impliedly reserves for his life an income or interest in the property transferred is a transfer subject to this part.

"§ 13645. *Same: Promises to make payments to or care for transferor.* A transfer conforming to Section 13641 and under which the transferee promises to make payments to or care for the transferor is a transfer subject to this part.

"§ 13648. *Declared purpose of act.* It is hereby declared to be the intent and purpose of this part to tax every transfer made in lieu of or to avoid the passing of property by will or the laws of succession."

### General Principles

Certain general principles are reasonably clear. █ The purpose of the inheritance tax statute is to tax successions occurring as the result of the death of the transferor, where

such transferor, regardless of the form of the transaction, has enjoyed some of the economic benefits of the property until his death. Practically every state has statutes generally similar to those above quoted which impose a tax on transfers intended to take effect in possession or enjoyment at or after the death of the transferor. Liability in such cases does not turn upon the intention of the grantor, but upon the character of the interests created by the transfer. It can be safely said that where the grantor retains, directly or indirectly, expressly or impliedly, the economic benefits of the transferred property, the transaction is taxable, and that the courts will look through any device by which the grantor secures those benefits for himself. The question as to whether there has been a transfer of title is not necessarily involved. The question is, has the unlimited and unrestricted right of possession or enjoyment of the property transferred been postponed until the death of the transferor? Thus, in *Estate of Madison*, 26 Cal.2d 453 [159 P.2d 630], the court held that a gift of income for the trustor's life with remainder at the trustor's death, with no reservation of any interest by the trustor, was taxable. The basis of the decision was that the death of the transferor changed, to some material degree, the rights of the donee of the property by removing certain shackles in the use and enjoyment of the property that had theretofore existed.

### General Principles Applied to the Instant Case

The general principles above set forth are not seriously in dispute. Nearly every state court in the land approves those principles, but there is no unanimity of application of them to particular transactions. It would unduly prolong this opinion to quote from, or attempt to analyze, the many apparently conflicting cases on this subject. Most of them are collected and commented upon in an article by Henry Rottschaefer entitled "Taxation of Transfers Taking Effect in Possession at Grantor's Death" appearing in 26 Iowa Law Review 514. Most of the cases cited by both parties to the present appeal are discussed and commented upon in that article, and a quotation from it will later be set forth herein.

The first contention of appellant is that the transfers here involved were commercial in nature, amounting to the purchase of an annuity by Ida from the university for an inadequate consideration; that they were commercial transac-

tions and not gifts, and that there is no tax imposed by the statute on annuities. These contentions are unsound.

While it is, of course, true that the money paid over for the purchase of an annuity is not taxable under an inheritance tax statute such as ours, for the obvious reason that such a transfer is not intended to take effect in possession or enjoyment at or after death, for this rule to apply, the transfer must involve the purchase of an annuity and not the making of a gift. Moreover, in the purchase of an annuity the consideration paid the annuitant is adequate. The transactions here involved were undoubtedly primarily donative in purpose. Ida made various gifts to the university but attempted to and did retain some of the economic benefits of the donated property. She reserved to herself, in effect, a life income. That the primary purpose of Ida was donative and was not to purchase an annuity, in the commercial sense, is made crystal clear by the various amendments to the original agreement which decreased the amount of the payments to be made to Ida. These various reductions also indicate that, so far as the payments to be made to her were concerned, all she desired was to realize the actual income produced from the fund. Thus, by the agreement of February 1, 1938, Ida gave up her right to the various rates of interest agreed upon, and agreed to take only the net income earned by the fund, with a guaranteed minimum of $1,600. By the agreement of October 13, 1941, she agreed to a further reduction. The agreements constantly refer to the transfers as "donations" or "gifts." The general informality surrounding these transactions, and the frequent changes in the basic agreement, demonstrate that the transactions were not commercial but donative in purpose.

It should be mentioned that Ida could have purchased annuities from an insurance company that would have given her the payments required for much less than she gave the university. Thus, for the initial $20,000 she received an agreement to pay her $1,200 annually. An equivalent annuity could have been purchased by her, at her then age, for $12,519. As the basic agreement was subsequently amended, and the amount of payments reduced, and as she grew older, the disparity became much larger.

The real question in this case is not whether these transactions were gifts or amounted to the purchase of an annuity, but whether the full possession or enjoyment of the

funds by the university did not occur until at or after the death of Ida. If the original agreement had reserved the net income of the fund to Ida, there would be no doubt that the transaction would be taxable inasmuch as the full enjoyment of the fund by the university would then clearly have been postponed until the death of the donor. Nearly all of the decided cases so hold. But, does it make any difference that in form the transaction is a transfer of the fund to the donee, and the agreement is to pay a fixed sum for life to the donor which in fact is measured by a fixed rate of interest on the fund? The original agreement was to pay 6 per cent on the donated fund; the agreement of April 26, 1927, provided for 5 per cent interest on the $5,000 new gift, and 6 per cent on the old one; the agreement of January 6, 1931, provided for 5 per cent on the new gift; on August 10, 1935, the parties reaffirmed the 6 per cent agreement as to the first $20,000, 5 per cent on the two $5,000 gifts, and 4 per cent on the one then made; on February 1, 1938, it was agreed that she was to receive 4 per cent on the $40,000. In form, the transaction was a complete transfer of the fund, with an independent agreement by the university to pay a fixed sum for life to the donor. If the form of the transactions be disregarded, and their substance be considered, it is apparent that the parties first expressly provided that the fund should be kept intact, and, secondly, that they intended that such fund should not be substantially diminished by any payments made to the donee. It is equally clear that, from a practical standpoint, the parties intended and expected that the donated fund would create the income to be paid to the donee. From a practical and realistic standpoint, the case is simply one where the donee has reserved the net income to the fund for life. This being so, the transfers are taxable under the sections already mentioned.

This conclusion seems so clear that it would not be necessary to further discuss it were it not for the fact that some courts have emphasized the technical form of similar transfers and held them nontaxable, while others have emphasized the substance and held them taxable. There are many cases on this subject and they are in hopeless conflict. Many of them are cited and discussed by the parties hereto in their briefs. The following passage from the article by Professor Rottschaefer in 26 Iowa Law Review 514, 521, contains a reasonably accurate analysis of most of these cases: ''The typical case of a transfer includable in the class of transfers intended,

etc., because of the grantor's reservation of the income from the transferred property for his life is one in which the reservation is of the income earned by such property. The courts have frequently had to determine to what extent that relation between income and property is essential to the existence of such a taxable transfer. The problem has arisen because a grantor has made an outright transfer of property in exchange for an enforceable promise that the grantee will confer upon him for his life specified economic benefits of the kind that could have been obtained directly by retaining the property. A promise by the grantee to support the grantor for life, unaccompanied by any obligation to apply thereto the property or its income, is generally held to confer upon the grantee an unlimited present right of using and enjoying the transferred property, and this is held to render the transfer not taxable as one intended, etc. (*In re Thorne's Estate,* 44 App.Div. 8, 60 N.Y.Supp. 419.) The same result has been reached where the grantee's promise is to pay the grantor an annual amount which was in fact equal to six per cent on the sum transferred. (*In re Honeyman's Estate,* 98 N.J.Eq. 638, 129 A. 393.) If, however, the promise is to pay interest as such, the transfer is held taxable on the theory that this effects a postponement of the grantee's actual enjoyment of the property until the grantor's death. (*Fidelity Union Trust Co.* v. *Martin,* 118 N.J.L. 277, 192 A. 74; *In re Barber's Estate,* 304 Pa. 235, 155 A. 565; *Todd's Estate,* 237 Pa. 466, 85 A. 845.) *The distinction between these cases is purely formal, and it is questionable whether the mere difference in the forms of the promises therein involved should entail such different tax results.* A promise by the grantee to pay the grantor a definite annuity for life which is not required to be paid out of the property or its income and is payable whether or not there be any such income is also held to involve no reservation by the grantor of any economic benefits from the property, and the transfer of the property in exchange therefor is not deemed to make it taxable. (*People* v. *Union Christian Missionary Society,* 341 Ill. 251, 173 N.E. 132; *Fidelity Union Trust Co.* v. *Martin, supra; In re Edgerton's Estate,* 35 App.Div. 125, 54 N.Y.Supp. 700; *In re Krause's Estate,* 325 Pa. 479, 191 A. 162; *In re Hamilton's Estate,* 217 Wis. 491, 259 N.W. 433.) If however, the transfer is expressly made subject to the agreement to pay the annuity, or the property is in effect made security for the performance of the promise, some courts hold the transfer to be taxable

(*Fidelity Union Trust Co.* v. *Martin, supra*), while others deny that this effects any postponement of the enjoyment of the property by the grantee until grantor's death. (*In re Edgerton's Estate, supra.*) All courts would agree that a promise to pay the annuity out of the income or, if necessary, the principal of the transferred property would render the transfer taxable. (*Estate of Schuh*, 66 Mont. 50, 212 P. 516.) It is undoubtedly technically correct to hold that the grantee's possession and enjoyment are not postponed when he is under no obligation to devote either the principal or interest to the discharge of his promise to pay the grantor the specified annuity. *However, it cannot be overlooked that the annuity is usually fixed at an amount bearing a close equivalence to the income expected to be realized from the transferred property, and that the grantee's capacity to meet his promise is frequently due to his acquisition of said property and is in any case enhanced by its acquisition.* On the other side is the consideration that he bears the risk of losses in the value of the property and may be called upon to make good his promise even after that has ceased to produce any income." (Italics added.)

The author concludes that most of the courts today are no longer using the technical and formal reasoning once employed, but are looking to see, from a realistic standpoint, what economic benefits are in fact shifted by the questioned transfer. If the shift of such benefits "is in any manner dependent upon the grantor's death, taxability is affirmed. . . . The change in emphasis is likely to mean that those courts which have not yet decided whether particular transfers are within the defined class will include some that earlier decisions have held not includable." (P. 547.)

The leading cases relied upon by appellants are *In re Honeyman's Estate*, 98 N.J.Eq. 638 [129 A. 393], and *In re Krause's Estate*, 325 Pa. 479 [191 A. 162], which involved transfers substantially similar to those here involved, and where the courts held the transfers not taxable. (See, also, *Raymond* v. *Commissioner of Internal Revenue*, 114 F. 2d 140, involving the federal income tax, but where a somewhat similar problem was involved.) The reasoning employed in these cases is typical of the formal and technical distinctions employed by the courts that hold such transactions nontaxable. The respondent places great reliance on *Fidelity Union Trust Co.* v. *Martin*, 118 N.J.L. 277 [192 A. 74] aff. 119 N.J.L. 425 [197 A. 40]), and claims that it indicates a change in

attitude on the part of the New Jersey courts. No good purpose would be served by quoting from these cases at length. We think that the modern, proper, and realistic view is that where a transfer is made to a charitable institution subject to an agreement to pay yearly to the donor for life a specified sum approximating the income earned by such fund, the transfer is subject to the tax because it is apparent that the full enjoyment of the fund cannot be realized by the charity until the obligation to make the payments ceases—i.e., upon the death of the donor. Even though the transfer is in form absolute and the obligation to pay the yearly stipend in form is independent, the transfer is taxable. This is so because, even though the particular funds contributed may be expended for the general purposes of the charity (that is not so in the instant case), it is apparent that, from a practical standpoint, the charity must either use the donated funds or tie up an equivalent sum from other sources in order to realize the income to pay the donor. We think this rule has been adopted in this state in the *Estate of Madison,* 26 Cal.2d 453 [159 P.2d 630]. In that case A created three *inter vivos* trusts to last for the life of A. In two of them the income was to be paid to the named beneficiaries during A's life and they were to get the corpus upon his death. In the third trust the income was to be accumulated for the named beneficiary until A's death, and, upon his death, to be paid with the corpus to the beneficiary. The case is a much closer one than the instant case because there the grantor reserved no rights of any kind over the property and received, so far as the agreement is concerned, no benefits from the property or from the beneficiaries. Nevertheless, an inheritance tax on the balance remaining in the trusts at the time of A's death was imposed. It was held by a majority of the Supreme Court that, from a realistic standpoint, the gifts were intended to take effect in possession or enjoyment at or after the death of A within the meaning of the statute. It was held that the "shackles" of the trust which prevented enjoyment by the beneficiaries during A's life were that the beneficiary interests were contingent upon the beneficiaries surviving A—they were his children; the trusts contained spendthrift provisions; the beneficiaries could not dispose of their interests in the corpus during A's lifetime. In so holding, Mr. Justice Traynor, speaking for the majority, stated (p. 457): "The issue is not whether the donor retained some power or interest until his death, but rather whether he tied up the property

with so many strings, which could not be loosened until his death, that the transfer may be regarded as having been intended to take effect in possession or enjoyment at his death within the meaning of the statute. It should be noted at the outset that the statute speaks, not of title, but of possession and enjoyment.''

That reasoning clearly indicates that in this state we have approved the modern, realistic view of such transfers, and abandoned the technical formalistic approach advocated by appellants and adopted by some courts.

It. is worthy of mention that the case of *May* v. *Heiner,* 281 U.S. 238 [50 S.Ct. 286, 74 L.Ed. 826, 67 A.L.R. 1244], so strongly relied upon in the dissenting opinion in the Madison case, was recently (Jan. 17, 1949) expressly overruled by the United States Supreme Court in *Commissioner of Int. Rev.* v. *Church,* 335 U.S. 632 [69 S.Ct. 322, 93 L.Ed. ——]. In the Heiner case it had been held that the corpus of a trust transfer need not be included in a grantor's estate for federal estate tax purposes even though the grantor had retained a life income from the corpus. This was reversed, even in an estate tax case where the tax is levied on the right to transmit property. An inheritance tax is, of course, levied on the right to receive. The Supreme Court of United States discusses, at length, the history of decisions interpreting the phrase ''possession or enjoyment'' and then declares that the states ''with what appears to be complete unanimity'' (p. —— [93 L.Ed.]) have agreed that, in interpreting the clause, the courts do not look merely at the passing of title, but look to see whether the transferor has in fact parted, during his lifetime, with his possession and enjoyment of the property. At page —— [93 L.Ed.] the court reaffirmed the doctrine of *Helvering* v. *Hallock,* 309 U.S. 106 [60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368], in which it had stated: '' 'In determining whether a taxable transfer becomes complete only at death we look to substance, not to form . . . However we label the device [if] it is but a means by which the gift is rendered incomplete until the donor's death' the 'possession or enjoyment' provision applies.'' The court also reaffirmed *Goldstone* v. *United States,* 325 U.S. 687 [65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1320], and at page —— [93 L.Ed.] quoted, with approval, from that case the reference to the Hallock case as follows: ''It thus sweeps into the gross estate all property the ultimate possession or enjoyment of which is held in suspense until the moment of the decedent's death or thereafter. . . .

Testamentary dispositions of an *inter vivos* nature cannot escape the force of this section by hiding behind legal niceties contained in devices and forms created by conveyancers." In the Church case the court stated (p. —— [93 L.Ed.]): ". . . passage of the mere technical legal title to a trustee is not necessarily crucial in determining whether and when a gift becomes 'complete' for estate tax purposes. Looking to substance and not merely to form, . . . the inescapable fact is that Church retained for himself until death a most valuable property right in these stocks—the right to get and to spend their income . . . Even if the interest of Church was merely 'obliterated,' in *May* v. *Heiner* language, it is beyond all doubt that simultaneously with his death, Church no longer owned the right to the income; the beneficiaries did. It had then 'passed.' It never had before. For the first time, the gift had become 'complete.' "

Under the reasoning of these cases, and particularly under the reasoning of the Madison case, even if Ida Hyde had relinquished all controls over the property, which, in view of the various modications of the agreement she apparently had not, it is quite clear that complete enjoyment of the transferred funds did not pass to the university until Ida's death, inasmuch as the university assumed an obligation to pay her annual payments which constituted, from a realistic standpoint, a charge upon the property. The transfers are therefore taxable. This conclusion makes it unnecessary to pass on the question as to whether the transfers are taxable under section 13645 of the Revenue and Taxation Code above quoted. That section was first passed in 1935 (Stats. 1935, ch. 358, pp. 1266, 1268), and, since such statutes are not retroactive, it could only apply to the two $5,000 gifts made subsequent thereto. The other sections above quoted are sufficient without the necessity of relying on section 13645 at all.

At the oral argument the court suggested that if the transfers were taxable, perhaps they should be treated as partly gifts and partly purchases of annuities, and exempted from the tax to the extent that the transferor received consideration of actual value. Supplemental briefs were filed on this point. According to the computations of counsel, had Ida purchased annuities from insurance companies to pay her the amounts required by the various agreements, their total cost would have been $19,815.03, thus leaving $20,184.97 as the amount of the five gifts instead of $40,000.

After carefully considering the question we are convinced that, under the statute, the entire value of all the transfers is taxable.

While the suggested result would undoubtedly be equitable, and while many statutes imposing similar taxes recognize such an equitable principle, general principles of equity have no application to tax statutes. Subject only to constitutional limitations, the statute is the measure of the tax.

New Jersey, in *Fidelity Union Trust Co.* v. *Martin,* 118 N.J.L. 277 [192 A. 74], held, in a case similar to the instant one, that, where the transferor received some consideration for the transfer, the value of such consideration should be deducted in computing the tax. The New Jersey statute (Public Laws of 1931, ch. 303, p. 749) is far less specific than ours. The same can be said about *Raymond* v. *Commissioner of Internal Revenue,* 114 F.2d 140, where the federal income tax was involved and where the equitable principle under discussion was applied. This was done because the language of the statute permitted it.

Our statute is clear on the point. Even appellant admits that, read "literally," no deduction can be permitted. Sections 13401-13403 of the Revenue and Taxation Code provide that the tax shall be computed upon the clear market value of the transferred property, less certain deductions, none of which here exists. Section 13641 provides that "Any transfer . . . without a valuable and adequate consideration, is a transfer subject to this part." "Valuable and adequate consideration" is defined as "a consideration equal in money or money's worth to the full value of the property transferred." No statutory exemption or reduction is allowed where the consideration is inadequate in the case of the inheritance tax, although it is in the case of the gift tax statute. (Rev. & Tax. Code, § 15106.)

It will be noted that our present statute above quoted defines consideration in terms of full money's worth. Under the old inheritance statute (Stats. 1911, p. 713) which required the consideration to be "valuable and adequate" but did not define consideration in terms of full money's worth, the courts nevertheless looked to see if the consideration was in fact adequate as well as valuable. In the case of *Estate of Reynolds,* 169 Cal. 600 [147 P. 268], the court held that an agreement to assume $30,000 in debts and to pay the donor $600 a month for life, while valuable, was an inadequate consideration for a gift of over $100,000. The tax was levied on

the full $100,000. The State of Massachusetts has a statute substantially similar to ours, and the courts of that state have held that where there is no provision in the statute for partial exemption on account of partial consideration, the total gift must be taxed. (*Worcester County Nat. Bank* v. *Commissioner of Corp. & Tax.*, 275 Mass. 216 [175 N.E. 726] ; *Saltonstall* v. *Treasurer and Receiver General*, 256 Mass. 519 [153 N.E. 4].) Harsh though our statute may be, the remedy lies with the Legislature and not with the courts.

The portion of the order appealed from is affirmed.

Ward, J., and Bray, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 21, 1949. Shenk, J., and Schauer, J., voted for a hearing.